Stephen M. Orlofsky
New Jersey Resident Partner
BLANK ROME LLP
301 Carnegie Center, 3d Floor
Princeton, NJ 08540
Telephone: (609) 750-7700

John A. Gibbons
(*pro hac vice* application to be filed)
BLANK ROME LLP
1825 Eye Street, NW
Washington, DC 20006
Telephone: (202) 420-2200

Henry M. Kuller
(*pro hac vice* application to be filed)
BLANK ROME LLP
One Logan Square 130
North 18th Street
Philadelphia, PA 19103
Telephone: (215) 569-5500

*Attorneys for Plaintiff Milk Industry Management Corporation t/a Balford Farms*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MILK INDUSTRY MANAGEMENT CORPORATION TRADING AS BALFORD FARMS, | )<br>)<br>)<br>) |
| Plaintiff, | ) Civil Action No. _____ |
| vs. | )<br>) |
| TRAVELERS INDEMNITY COMPANY OF AMERICA, | )<br>)<br>) |
| Defendant. | ) |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Milk Industry Management Corporation trading as Balford Farms ("MIMCO"), by its attorneys, Blank Rome LLP, hereby files this Complaint against Defendant Travelers Indemnity Company of America ("Travelers") and in support thereof, avers as follows:

## INTRODUCTION

1. This action arises out of an insurance dispute over the coverage available to MIMCO under an insurance policy sold by Travelers. MIMCO seeks a declaration of its rights and Travelers' obligations under the insurance policy, damages for breach of contract for Travelers' refusal to pay certain losses as required by the insurance policy, along with interest, attorneys' fees, costs, and such other further relief as the Court may deem just and proper.

## PARTIES

2. MIMCO is a Pennsylvania corporation with its principal place of business at 4 Manhattan Drive, Burlington, New Jersey.

3. Travelers is an insurance company incorporated in the State of Connecticut with its principal place of business at One Tower Square, Hartford, Connecticut. *See* Travelers Complaint with Jury Demand, *Travelers Indem. Co. of Am. v. Absolutely Energized Solar Elec., Inc.*, No. BURL-2297-14, at ¶ 2 (N.J. Super. Ct. Sept. 24, 2014).

## JURISDICTION AND VENUE

4. This is an action for a declaratory judgment brought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and Federal Rule of Civil Procedure 57; for damages for breach of contract; and for further necessary and appropriate relief.

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between MIMCO and

Travelers, and the amount in controversy exceeds $75,000.00, exclusive of interest, attorneys' fees, and costs.

6. This Court has personal jurisdiction over Travelers because Travelers is licensed to do business in New Jersey, transacted and continues to transact the business of selling insurance in New Jersey, and has otherwise purposefully availed itself of the jurisdiction.

7. Venue is proper in the United States District Court for the District of New Jersey under 28 U.S.C. §§ 1391(b)(1) and (2) because Travelers' business activities within the District subject it to personal jurisdiction and a substantial part of the events or omissions giving rise to the action occurred within the District.

**MIMCO'S BUSINESS**

8. MIMCO is a distributor for butter, cheese, fluid milk, and associated dairy and other food products for its own account and the accounts of third parties.

9. On July 30, 2012, MIMCO and Dairy Farmers of America ("DFA") entered into a Warehousing and Distribution Services Agreement (the "DFA Services Agreement") and an Asset Purchase Agreement (collectively, the "DFA Agreements"), pursuant to which MIMCO acquired the right to receive, store, warehouse, load out, and distribute certain of DFA's products to certain of DFA's customers for a term of five (5) years, automatically renewing for subsequent two-year terms.

10. During the negotiations for the DFA Agreements, DFA provided MIMCO with information regarding DFA's 2011 clients and volume of sale of the relevant products sufficient to establish a volume of in excess of seventy (70) million pounds of product annually to be distributed by MIMCO under the DFA Services Agreement.

11. Based on the information DFA provided, MIMCO negotiated a fee structure predicated on a volume in excess of seventy (70) million pounds annually that would result in

substantial net profits to MIMCO for the services provided by MIMCO for the entire duration of the DFA Services Agreement.

12. Part of this fee structure was a "shortfall fee" payable to MIMCO in the event that the actual quantity of product delivered fell short of certain contractually stipulated minimum targets.

13. DFA and MIMCO set contractually stipulated minimum targets for the shortfall fee of sixty (60) million pounds per year for the first two (2) years of the DFA Agreements and fifty-five (55) million pounds per year for the following years.

14. DFA gave MIMCO no reason to believe that product volume would decrease from the amounts distributed in 2011.

15. On August 20, 2012, MIMCO entered into a Warehouse Services Agreement with Black Bear Distribution LLC ("Black Bear") for the purpose of subcontracting the receipt, storage, and load out of DFA's product to Balford trucks at Black Bear's frozen and refrigerated warehouse storage facilities located at 1000 Cooperstown Road, Delanco, New Jersey (the "Black Bear Facility").

16. Thereafter MIMCO commenced distributing product to DFA's customers in September 2012.

17. MIMCO retained responsibility for the transportation of DFA products to customers, as well as for other services.

## THE POLICY

18. Travelers sold a package insurance policy, No. Y-630-5076A285-TIA-13, to MIMCO for the policy period July 1, 2013, to July 1, 2014 (the "Policy"). A true and correct copy of the Policy is attached hereto as Exhibit A.

19. The Policy contains a Deluxe Property Coverage ("Property") that, in turn, contains a Deluxe Business Income (and Extra Expense) Coverage Form (the "BI Form").

20. The Policy provides coverage for "Business Income (and Extra Expense)" up to $16,167,000.

21. The Policy provides coverage for "Business Income" sustained "due to the necessary 'suspension' of your 'operations' during the 'period of restoration'" "caused by direct physical loss of or damage to property at [covered] premises" if the loss or damage was "caused by or result[ed] from a Covered Cause of Loss." See Policy, BI Form § A.

22. The Policy protected MIMCO against a wide array of business risks, including, *inter alia*, the risk that a fire at the Black Bear Facility could adversely impact MIMCO.

23. DFA and Black Bear are included on the Policy as Additional Insureds.

24. The Black Bear Facility is a covered premise. See Policy, Location Schedule.

25. Fire is a Covered Cause of Loss. See Policy, BI Form §§ 3 and 4, Property § B, Declarations, Endorsements.

26. "Business Income" is the sum of Net Income that would have been earned or incurred; plus continuing normal operating expenses incurred, including payroll. See Policy, BI Form § A(1)(a).

27. Pursuant to BI Form § E(3)(a):

> The amount of Business Income loss will be determined based on:
>
> (1) The Net Income of the business before the direct physical loss or damage occurred;
>
> (2) The likely Net Income of the business if no physical loss or damage occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business as a result of favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

5

(3) The operating expenses, including payroll expenses necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

(4) other relevant sources of information . . . .

28. The Period of Restoration for Business Income coverage begins 24 hours after the time of direct physical loss or damage. *See* Policy, BI Form § G(4)(a)(1).

29. The Period of Restoration "[e]nds on the earlier of: (a) the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (b) [t]he date when business is resumed at a new permanent location." *Id.* at G(4)(a)(2).

30. Extended Business Income provides coverage for "actual loss of Business Income" incurred during the period (a) beginning on "the date property . . . is actually repaired, rebuilt or replaced and 'operations' are resumed; and (b) ends on the earlier of (i) [t]he date you could restore your 'operations', with reasonable speed, to the level which would generate the Business Income amount that would have existed if no direct physical loss or damage had occurred;" or (ii) 365 days. Policy, BI Form § A(4)(e), Part Declarations.

31. The Policy also provides coverage for "Extra Expense" incurred "during the 'period of restoration'" "caused by direct physical loss of or damage to property at [covered] premises" if the loss or damage was "caused by or result[ed] from a Covered Cause of Loss." Policy, BI Form § A.

32. Pursuant to BI Form § A(2):

Extra Expense means reasonable and necessary expenses described in a., b. and c. below that you incur during the "period of restoration" and that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss:

a. Expenses to avoid or minimize the "suspension" of business and to continue "operations" at:

6

    (1) The described premises; or

    (2) Replacement premises or temporary locations, including:

        (a) Relocation expenses; and

        (b) Costs to equip and operate the replacement premises or temporary locations;

b. Expenses to minimize the "suspension" of business if you cannot continue "operations"; or

c. Expenses to repair or replace property, but only to the extent the amount of loss that otherwise would have been payable under this Coverage Form is reduced.

33. Pursuant to BI Form § E(3)(b), "the amount of Extra Expense will be determined based on: (1) [a]ll reasonable and necessary expenses that exceed the normal operating expenses that would have been incurred by 'operations' during the 'period or restoration' if no direct physical loss or damage had occurred" and (2) "[a]ll reasonable and necessary expenses that reduce the Extra Expense loss that otherwise would have been incurred."

34. The Period of Restoration for Extra Expense coverage begins immediately after the time of direct physical loss or damage.

### THE FIRE

35. At approximately 1:30 p.m. on September 1, 2013, a fire broke out on the roof of the Black Bear Facility.

36. The local fire department arrived at the Black Bear Facility at 1:45 p.m. and observed the fire in the center area of the roof, approximately 50 x 100 ft. in size.

37. Upon entering the building, the fire department observed flames at the ceiling level covering an area of approximately 10 x 10 feet.

38. Firefighters were unable to contain the fire for over twenty-four hours.

39. All goods at the Black Bear Facility were declared a total loss due to the fire.

40. The Black Bear Facility itself collapsed and was completely destroyed.

41. On September 13, 2013, MIMCO terminated its contract with Black Bear under the Force Majeure provisions of the contract because Black Bear no longer had the ability to perform the contract by reason of the complete destruction of the Black Bear Facility by the fire.

42. In an effort to mitigate its losses and continue operations under the DFA Agreements, MIMCO quickly attempted to procure alternate warehouse space and services capabilities in order to continue its full performance of services under the DFA Services Agreement.

43. MIMCO was unable to find any warehouses possessing the capacity to warehouse all of DFA's product and to provide the logistical, technological, and other services required by DFA that Black Bear had provided prior to the fire.

44. MIMCO ultimately located an alternate warehouse with space and capabilities sufficient to maintain only a portion of the DFA-required storage, capabilities, and deliveries, in an attempt by MIMCO to mitigate its losses, fulfill its responsibilities under the DFA Services Agreement, and maintain the long-term business relationship with DFA. However, this alternate location did not provide MIMCO with the ability to fully provide the services it rendered to DFA prior to the fire.

45. In addition to being unable to satisfy all of DFA's requirements, this alternate warehouse space also became available at an extra cost for warehousing, transportation, labor, and other expenses, causing additional extra expense and an additional loss of Business Income.

46. As a result of the fire, DFA re-commenced the direct storage and distribution of a significant portion of its product after MIMCO was unable to find substitute warehouse space suitable for the provision of all services under the DFA Services Agreement.

47. MIMCO suffered increasing losses due to decreased volume and services fees, and increased expenses.

48. In June 2014, Black Bear's affiliate announced it would not re-build in the same geographical area or on the same scale as the Black Bear Facility.

49. Upon information and belief, Black Bear's affiliate re-built a significantly smaller facility in Philadelphia, Pennsylvania, which opened approximately thirty months following the fire at the Black Bear Facility. However, that facility was not constructed to the scale or sophistication required by MIMCO for the conduct of the MIMCO-DFA business, nor was MIMCO offered an opportunity to enter into a services agreement for the new facility.

50. Effective January 31, 2015, MIMCO and DFA mutually agreed to terminate the DFA Agreements as a result of the fire because MIMCO was unable to find a suitable replacement facility to enable MIMCO to efficiently and fully perform the services to be provided to DFA under the DFA Services Agreement.

51. As a result of the fire, MIMCO incurred significant Business Income loss, Extra Expense, and claim preparation loss.

52. As a result of the fire, MIMCO lost its business relationship under the DFA Services Agreement with DFA.

53. MIMCO's losses are in excess of $7 million.

## CLAIM SUBMISSION AND HANDLING

54. MIMCO promptly tendered notice of an insurance claim for Business Income and Extra Expense due to the fire (the "Claim") no later than September 3, 2013.

55. No later than February 26, 2014, Travelers conceded coverage for the Claim by making payments to MIMCO and DFA under the Policy.

56. Subsequent to tendering notice of the Claim, MIMCO cooperated with Travelers' investigation, including but not limited to:

    a. MIMCO provided Travelers with information and documents;

    b. MIMCO responded to Travelers' requests for information and documents promptly;

    c. MIMCO made its personnel available to Travelers;

    d. MIMCO worked with Travelers' claims adjuster, Robert Hughes, and other Travelers' employees and agents;

    e. MIMCO made its claim adjuster, Young Adjustment Company, Inc., available to Travelers;

    f. Young Adjustment Company, Inc. worked with Travelers' third-party accounting firm, Meaden & Moore; and

    g. MIMCO and Young Adjustment Company, Inc. met with Travelers on several occasions and communicated with Travelers regularly on a timely basis.

57. Travelers failed to properly analyze MIMCO's loss determination under Policy § E(3)(a)(2).

58. As of the filing of this Complaint, Travelers has not paid the remaining portion of the proceeds to which Travelers concedes MIMCO is entitled under the Policy, nor presented MIMCO with a good faith offer of settlement.

## COUNT I
## (BREACH OF CONTRACT)

59.     MIMCO restates and realleges all of the foregoing paragraphs of this Complaint as though fully set forth herein.

60.     MIMCO has fully complied with all of the terms and conditions of the Policy with regard to the Claim.

61.     Despite the passage of more than thirty-two (32) months since the fire at the Black Bear Facility giving rise to the Claim, Travelers refused and continues to refuse to agree to pay MIMCO for the Claim, subject to Travelers' applicable limits of liability.

62.     Travelers' refusal to pay MIMCO for the Claim constitutes a material breach of Travelers' obligations under the Policy.

63.     Travelers' breach of the Policy has proximately caused MIMCO harm for which MIMCO is entitled to damages according to proof, but in any event exceeding $75,000.00, exclusive of interest, attorneys' fees, and costs.

64.     By reason of the foregoing, Travelers is liable to MIMCO for the amount of the Claim and for additional damages MIMCO has sustained as a result of Travelers' breach of its contract.  The exact amount of such damages include, but are not limited to: amounts MIMCO has incurred in establishing the extent of its losses; consequential damages; pre- and post-judgment interest; and attorneys' fees, costs, and disbursements MIMCO has incurred to date and may incur in the future in prosecuting this action to obtain the benefit of its insurance coverage.

## COUNT II
## (DECLARATORY JUDGMENT)

65.     MIMCO restates and realleges all of the foregoing paragraphs of this Complaint as though fully set forth herein.

11

66. MIMCO has fully complied with all of the terms and conditions of the Policy with regard to the Claim.

67. A justiciable controversy exists between MIMCO and Travelers as to their respective rights and obligations, and the scope of coverage owed to MIMCO for the Claim under the Policy.

68. MIMCO seeks a judicial determination to resolve a present justiciable controversy among the parties regarding the coverage of the Claim under the Policy.

69. MIMCO is entitled to a judicial declaration by the Court that Travelers is obligated to indemnify MIMCO for the Claim to the full extent prescribed in the Policy.

70. The issuance of declaratory relief by this Court will terminate some or all of the existing controversy among the parties.

## **PRAYER FOR RELIEF**

**WHEREFORE**, MIMCO respectfully requests an order as follows:

a. Awarding MIMCO compensatory and consequential damages in an amount to be awarded at trial;

b. Declaring that Travelers is obligated to indemnify MIMCO for the Claim;

c. Awarding MIMCO its attorneys' fees and costs of suit;

d. Awarding MIMCO interest; and

e. Awarding MIMCO any other and further relief as this Court deems just and proper.

## **JURY DEMAND**

71.     MIMCO hereby requests a jury trial on all claims so triable.


Dated:  April 29, 2016

                                                            BLANK ROME LLP

                                                            By:     /s/ Stephen M. Orlofsky

| | |
|---|---|
| John A. Gibbons | Stephen M. Orlofsky |
| (*pro hac vice* application to be filed) | Orlofsky@BlankRome.com |
| JGibbons@BlankRome.com | 301 Carnegie Center |
| BLANK ROME LLP | Third Floor |
| 1825 Eye Street, NW | Princeton, NJ 08540 |
| Washington, DC 20006 | Telephone: (609) 705-7700 |
| Telephone: (202) 420-2200 | Facsimile: (609) 750-7701 |
| Facsimile: (202) 420-2201 | |
| | *Attorneys for Plaintiff Milk Industry* |
| Henry M. Kuller | *Management Corporation t/a Balford* |
| Kuller@BlankRome.com | *Farms* |
| (*pro hac vice* application to be filed) | |
| BLANK ROME LLP | |
| One Logan Square 130 | |
| North 18th Street | |
| Philadelphia, PA 19103 | |
| Telephone: (215) 569-5500 | |
| Facsimile: (215) 569-5555 | |

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Plaintiff Milk Industry Management Corporation t/a Balford Farms hereby certifies that, to its knowledge, the matter in controversy in this action is not the subject of any other pending lawsuit, arbitration, or administrative proceeding.

Dated: April 29, 2016

                                                  Respectfully submitted,

                                                  By:   /s/ Stephen M. Orlofsky

| | |
|---|---|
| John A. Gibbons<br>(*pro hac vice* application to be filed)<br>JGibbons@BlankRome.com<br>BLANK ROME LLP<br>1825 Eye Street, NW<br>Washington, DC 20006<br>Telephone: (202) 420-2200<br>Facsimile: (202) 420-2201 | Stephen M. Orlofsky<br>Orlofsky@BlankRome.com<br>BLANK ROME LLP<br>301 Carnegie Center<br>Third Floor<br>Princeton, NJ 08540<br>Telephone: (609) 705-7700<br>Facsimile: (609) 750-7701 |
| Henry M. Kuller<br>Kuller@BlankRome.com<br>(*pro hac vice* application to be filed)<br>BLANK ROME LLP<br>One Logan Square 130<br>North 18th Street<br>Philadelphia, PA 19103<br>Telephone: (215) 569-5500<br>Facsimile: (215) 569-5555 | *Attorneys for Plaintiff Milk Industry Management Corporation t/a Balford Farms* |