# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MILK INDUSTRY MANAGEMENT CORPORATION, trading as BALFORD FARMS, | 1:16-cv-02403-NLH-AMD |
| Plaintiff, | **OPINION** |
| v. | |
| TRAVELERS INDEMNITY COMPANY OF AMERICA, | |
| Defendant. | |

<u>**APPEARANCES**</u>:

DAVID C. KISTLER
ROBYN LEIGH MICHAELSON
STEPHEN M. ORLOFSKY
BLANK ROME LLP
300 CARNEGIE CENTER, SUITE 220
PRINCETON, NJ 08540

HENRY M. KULLER (admitted *pro hac vice*)
BLANK ROME LLP
ONE LOGAN SQUARE
130 NORTH 18TH STREET
PHILADELPHIA, PA 19103-9668

JOHN A. GIBBONS (admitted *pro hac vice*)
BLANK ROME LLP
1825 EYE STREET NW
WASHINGTON, DC 20006
    On behalf of Plaintiff

YALE GLAZER
LAZARE POTTER & GIACOVAS LLP
875 THIRD AVENUE, 28TH FLOOR
NEW YORK, NY 10022
    On behalf of Defendant

<u>**HILLMAN**</u>, **District Judge**

    Presently before the court are Plaintiff's and Defendant's

cross-motions for partial summary judgment regarding Plaintiff's claim for business income insurance and extended business income insurance. The parties' dispute arises out of the termination of Plaintiff's dairy distribution contract caused by a catastrophic fire at the storage facility used by Plaintiff. For the reasons expressed below, Plaintiff's motion will be denied, and Defendant's motion will be granted.

## BACKGROUND

Milk Industry Management Corporation ("MIMCO"), trading as Balford Farms, is a distributor of butter, cheese, fluid milk, and associated dairy and other food products for its own account and the accounts of third parties. On July 30, 2012, MIMCO and Dairy Farmers of America ("DFA") entered into a Warehousing and Distribution Services Agreement (the "DFA Services Agreement") and an Asset Purchase Agreement (collectively, the "DFA Agreements"). Under these agreements, MIMCO acquired the right to receive, store, warehouse, load out, and distribute seventy million pounds annually of DFA's products to DFA's customers for a term of five years, automatically renewing for subsequent two-year terms.

On August 20, 2012, MIMCO entered into a Warehouse Services Agreement with Black Bear Distribution LLC ("Black Bear") for the purpose of subcontracting the receipt, storage, and load out of DFA's product to MIMCO trucks at Black Bear's frozen and

2

refrigerated warehouse storage facilities located in Delanco, New Jersey. MIMCO commenced distributing product to DFA's customers in September 2012.

At approximately 1:30 p.m. on September 1, 2013, a fire broke out on the roof of the Black Bear Facility. Firefighters were unable to contain the fire for over twenty-four hours. The Black Bear Facility collapsed and was completely destroyed. On September 13, 2013, MIMCO terminated its contract with Black Bear under the Force Majeure provisions of the contract because Black Bear no longer had the ability to perform the contract due to the fire and the complete destruction of its warehouse.

MIMCO claims that in an effort to mitigate its losses and continue operations under the DFA Agreements, MIMCO attempted to procure alternate warehouse space and services capabilities. MIMCO claims that it was unable to find any warehouses that had the capacity to warehouse all of DFA's product and to provide the logistical, technological, and other services required by DFA that Black Bear had provided prior to the fire. MIMCO eventually located an alternate warehouse with space and capabilities sufficient to maintain only a portion of the DFA-required storage, capabilities, and deliveries, but this alternate location did not provide MIMCO with the ability to fully provide the services it rendered to DFA prior to the fire, and it imposed extra costs, such as for warehousing, transportation, and labor.

In June 2014, Black Bear's affiliate announced it would not re-build in the same geographical area or on the same scale as the Black Bear Facility. MIMCO claims that effective January 31, 2015, MIMCO and DFA mutually agreed to terminate the DFA Agreements as a result of the fire because MIMCO was unable to find a suitable replacement facility to enable MIMCO to efficiently and fully perform the services to be provided to DFA under the DFA Services Agreement. As a result, MIMCO claims that it incurred significant financial losses, including business income loss and other expenses, totaling in excess of $9.7 million.

Previously, MIMCO purchased a package insurance policy, No. Y-630-5076A285-TIA-13, from Defendant, Travelers Indemnity Company of America ("Travelers"), for the policy period July 1, 2013, to July 1, 2014. The Policy covers Business Income and Extra Expense loss up to $16,167,000, and MIMCO claims that it purchased coverage specifically to account for the DFA business and paid a premium to extend the Policy coverage to include losses resulting from damage to the Black Bear warehouse. MIMCO also purchased enhanced coverage that provided for 365 days of Extended Business Income Coverage instead of the standard 180 days.

Within days of the fire at the Black Bear facility, MIMCO tendered notice of an insurance claim for Business Income and

Extra Expense due to the fire. Ultimately, Travelers paid MIMCO $11.6 million under the Policy for Business Personal Property ("BBP"), Business Income ("BI") (approximately $3 million), and Extra Expense ("EE"). MIMCO claims, however, that Travelers still owes it $7 million in BI coverage and for Extended Business Income ("Extended BI"). For Travelers' refusal to fully compensate MIMCO under the Policy, MIMCO seeks a declaratory judgment that MIMCO is entitled to the additional $7 million under the Policy, and it has asserted a claim for breach of contract.

Both parties have moved for partial summary judgment.[1] The heart of the instant dispute is the import of Black Bear not rebuilding its facility and MIMCO ultimately ceasing operations under the DFA contract. In order to calculate the amount of the insured loss under the BI provision, Travelers determined the Period of Restoration ("POR") under the policy, which Travelers based on the reasonable time it would have taken Black Bear to rebuild its facility – 23 months. In contrast, MIMCO contends that the proper method to determine the POR is based on its unfulfilled contract term with DFA – 48 months plus an additional

---

[1] According to Travelers, the issues that remain in dispute and are not the subject of the summary judgment motions are whether the DFA Contract's shortfall fee should be included as income to MIMCO, the proper application of a volume discount, MIMCO's revenue per pound for delivered product, and the variability of certain expenses. (Docket No. 39 at 17 n.5.)

24 months – because Travelers' use of a hypothetical restoration over which MIMCO had no control is contrary to the law and the Policy language. MIMCO further contends that because the Black Bear facility was never rebuilt and MIMCO never resumed its operations, a hypothetical POR when there is no restoration is not the appropriate guidepost for BI coverage.

The "no restoration" and "no resumption of business" issues also affect MIMCO's claim for Extended BI, should it not be awarded full compensation under the BI provision. Travelers argues that MIMCO is not entitled to Extended BI because that provision only provides coverage when an insured suffers certain BI losses after actually repairing, replacing, or rebuilding the damaged property, and then resuming operations, and MIMCO never did any of those things. MIMCO argues the that the Extended BI provision is ambiguous, and therefore should be construed in its favor to provide Extended BI to MIMCO.

MIMCO has moved for summary judgment in its favor on the POR issue. Travelers has moved for summary judgment in its favor on the Extended BI issue. Each party has opposed the other's motion.

## DISCUSSION

### A.    Subject matter jurisdiction

This Court has jurisdiction over the subject matter of this action under the Declaratory Judgment Act, 28 U.S.C. § 2201, and

pursuant to 28 U.S.C. § 1332(a) because there is complete
diversity of citizenship between Plaintiff and Defendant, and the
amount in controversy exceeds $75,000.00, exclusive of interest,
attorneys' fees, and costs.  Plaintiff is a citizen of
Pennsylvania and New Jersey, and Defendant is a citizen of
Connecticut.

**B.    Standard for Summary Judgment**

Summary judgment is appropriate where the Court is satisfied
that the materials in the record, including depositions,
documents, electronically stored information, affidavits or
declarations, stipulations, admissions, or interrogatory answers,
demonstrate that there is no genuine issue as to any material
fact and that the moving party is entitled to a judgment as a
matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 330
(1986); Fed. R. Civ. P. 56(a).

An issue is "genuine" if it is supported by evidence such
that a reasonable jury could return a verdict in the nonmoving
party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986).  A fact is "material" if, under the governing
substantive law, a dispute about the fact might affect the
outcome of the suit.  Id.  In considering a motion for summary
judgment, a district court may not make credibility
determinations or engage in any weighing of the evidence;
instead, the non-moving party's evidence "is to be believed and

7

all justifiable inferences are to be drawn in his favor."  <u>Marino</u>
<u>v. Industrial Crating Co.</u>, 358 F.3d 241, 247 (3d Cir.
2004)(quoting <u>Anderson</u>, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating
the absence of a genuine issue of material fact.  <u>Celotex Corp.</u>
<u>v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once the moving party has
met this burden, the nonmoving party must identify, by affidavits
or otherwise, specific facts showing that there is a genuine
issue for trial.  <u>Id.</u>  Thus, to withstand a properly supported
motion for summary judgment, the nonmoving party must identify
specific facts and affirmative evidence that contradict those
offered by the moving party.  <u>Anderson</u>, 477 U.S. at 256-57.  A
party opposing summary judgment must do more than just rest upon
mere allegations, general denials, or vague statements.  <u>Saldana</u>
<u>v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001).

**C. Analysis**

**1. *MIMCO's motion for summary judgment***

As with any insurance coverage dispute, the starting point
of the analysis is the language of the Policy.  The provisions
relevant to MIMCO's motion provide:

A. COVERAGE

We will pay for:

- The actual loss of Business Income you [MIMCO] sustain due
  to the necessary "suspension" of your "operations" during
  the "period of restoration"; and

8

- The actual Extra Expense you incur during the "period of restoration";

  caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income and Extra Expense Limit of Insurance is shown in the Declarations.  The loss or damage must be caused by or result from a Covered Cause of Loss. . . . if you occupy only part of the site at which the described premises are located, your premises means:

- The portion of the building which you rent, lease or occupy; and

- Any area within the building or on the site at which the described premises are located if the area services, or is used to gain access to, the described premises.

(Docket No. 1-1 at 62.)

  "Period of Restoration"

  a. [] means the period of time that:

  (1) (a) For Business Income coverage, begins once the number of hours of the applicable Business Income hour deductible, if any, expires following the time of direct physical loss or damage; . . .

  caused by or resulting from a Covered Cause of Loss at the described premises; and

  (2) Ends on the earlier of:

      (a) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

      (b) The date when business is resumed at a new permanent location.

(Docket No. 1-1 at 73.)

    MIMCO contends that the POR is the duration of the

distribution business that MIMCO was to provide under the

agreement with DFA – 48 months for the remaining term of the agreement after the date of the fire plus an additional 24 months that constituted the automatic renewal period for the distribution business.  MIMCO's position is based on the fact that MIMCO never resumed its business at a new permanent location, and it had no legal ability to have "repaired, rebuilt or replaced" the Black Bear warehouse and the services that were provided by that warehouse.  MIMCO therefore contends that it is wholly unreasonable to analyze the POR based on a hypothetical rebuild or repair of the Black Bear warehouse when it did not, and could not, rebuild, and it never resumed operations.

Travelers argues that the Policy language is clear and unambiguous that the POR is the date when business resumed, or based on an estimation of when the property "should be repaired, rebuilt or replaced with reasonable speed and similar quality." Travelers argues that the Policy does not provide for a POR based on MIMCO's contract with DFA, as the Policy insured MIMCO's business operations at the Black Bear facility, and not MIMCO's contract with DFA.

A recent New Jersey Appellate Division case sets forth the applicable standard for interpreting an insurance contract:

> "The interpretation of an insurance contract is a question of law . . . ." . . . . An insurance policy must be read as a whole, <u>Hardy ex rel. Dowdell v. Abdul-Matin</u>, 198 N.J. 95, 103 (2009), and will be enforced as written when its terms are clear, <u>Mem'l Props., LLC v. Zurich Am.</u>

Ins. Co., 210 N.J. 512, 525 (2012). "In assessing the
meaning of provisions in an insurance contract, courts first
look to the plain meaning of the language at issue." Oxford
Realty Grp. Cedar v. Travelers Excess & Surplus Lines Co.,
229 N.J. 196, 207 (2017) (citing Chubb Custom Ins. Co. v.
Prudential Ins. Co. of Am., 195 N.J. 231, 238 (2008)). "If
the language is clear, that is the end of the inquiry." "An
insurance policy is not ambiguous merely because two
conflicting interpretations of it are suggested by the
litigants." "[C]ourts should not write for the insured a
better policy of insurance than the one purchased." Boddy
v. Cigna Prop. & Cas. Cos., 334 N.J. Super. 649, 658 (App.
Div. 2000) (quoting Walker Rogge, Inc. v. Chelsea Title &
Guar. Co., 116 N.J. 517, 529 (1989)).

    If a policy provision is ambiguous, we construe the
provision in favor of the insured, considering the insured's
reasonable expectations. Shotmeyer v. N.J. Realty Title
Ins. Co., 195 N.J. 72, 82 (2008). Language in a policy of
insurance is genuinely ambiguous when "the phrasing of the
policy is so confusing that the average policyholder cannot
make out the boundaries of coverage." Weedo v. Stone-E-
Brick, Inc., 81 N.J. 233, 247 (1979). However, if a
provision is not ambiguous or otherwise misleading, we need
not consider the "objectively reasonable expectation" of the
average policyholder in interpreting the policy.

Barnes v. USAA Casualty Insurance Company, 2018 WL 2449134, at *1

(N.J. Super. App. Div. June 1, 2018) (some quotations and

citations omitted).

To support its view that the POR should be based on its

contractual term with DFA, and not on the estimation of when the

Black Bear facility "should be repaired, rebuilt or replaced with

reasonable speed and similar quality," MIMCO relies upon

Streamline Capital, L.L.C. v. Hartford Cas. Ins. Co., 2003 WL

22004888 (S.D.N.Y. 2003). In that case, Streamline occupied an

office suite in One World Trade Center during the terrorist

attacks of September 11, 2001.  Streamline filed a claim with
Hartford for business income losses.  Hartford determined that
the period of restoration ended on February 15, 2002, which would
have made it slightly more than five months long, but Streamline
argued the POR lasted twelve months plus thirty days – the
maximum time allowed in the policy – since the period could have
only been cut short by the rebuilding of One World Trade Center.

The court disagreed with Streamline.  Looking first to the
language of the policy, the court noted that the policy's POR
"[e]nds on the date when the property at the described premises
should be repaired, rebuilt or replaced with reasonable speed and
similar quality."  Streamline, 2003 WL 22004888, at *7.
Streamline argued that the term "property at the described
premises" meant the real and personal property at the World Trade
Center site, whether owned by Streamline or not, and that
consequently, the POR should have lasted until One World Trade
Center was rebuilt.  Id.  In contrast, Hartford argued that the
term meant property belonging to Streamline in Streamline's
offices, and thus the POR concluded by the time Streamline should
have been able to reestablish its operations, either at the World
Trade Center site or in some other location.  Id.

The court found that construing the words "described
premises" to mean Streamline's suite of offices in One World
Trade Center was a far more reasonable construction than taking

12

those words to mean either One World Trade Center or the World Trade Center site as a whole. Id. at *8. The court came to that conclusion because: (1) the policy provided coverage for "direct physical loss of or damage to Covered Property at the premises described in the Declarations," (2) the Declarations described an office suite, and (3) the term "premises" in the coverage provision, which applied to "Covered Property at the premises described in the Declarations," was clearly an office suite. Id. The court found that in the absence of any evidence to the contrary, the term "premises" had the same meaning in the POR provision. Id.

The court explained, "That the business income coverage only applies to the suspension of the plaintiff's 'operations' indicates that it is dependent only on replacing what is necessary to resume those operations - namely, the plaintiff's personal property [computers, desks, chairs, etc.], not a specific office at a specific location." Id. The court further explained that because the Declarations declared no buildings to be covered by the Policy, the Covered Property amounted to Streamline's personal property kept at its office suite. Id.

The court noted that the cases relied upon Streamline to support its position concerned insurance for businesses conducted at factories, processing plants, or other places where significant machinery is employed. Id. at *10. The court

distinguished those cases, observing that none of Streamline's cases contained language that referred to "property at the described premises," where the only reasonable construction of "premises" is an office suite. <u>Id.</u> The court further observed that "[s]uch operations are less easily transferrable, and thus tying the period of restoration in such cases to the time necessary to rebuild at the original site is more reasonable." <u>Id.</u> The court therefore denied Streamline's request for judgment that the POR lasted for twelve months plus thirty days (the maximum period) under the policy. <u>Id.</u>

Despite MIMCO's reliance on <u>Streamline</u>, this Court finds <u>Streamline</u> to actually support Travelers' position. Where in <u>Streamline</u> the "property at the described premises" was interpreted to mean the property – such as computers, desks and chairs – in an office suite within One World Trade Center, "the property at the described premises" in this case is indisputably the Black Bear facility and DFA's product MIMCO stored there. (Docket No. 1-1 at 92, 97.) While <u>Streamline</u> is similar to this case because neither the World Trade Center nor Black Bear's facility was "repaired, rebuilt or replaced," the <u>Streamline</u> court expressly distinguished the case before it and other cases like the one here, noting that tying the POR to the time necessary to rebuild at the original site was more reasonable when the "premises" was an entire facility in addition to the

property inside that facility.

MIMCO relies upon the _Streamline_ court's observation that "[i]t is wholly unreasonable to think that the period of restoration should be tied to the rebuilding of real property over which neither the insured nor the insurer had any control. . . . ." _Id._ at *8. That observation was made, however, in the context of concluding that the "property at the described premises" meant computers, desks and chairs in a suite of offices in One World Trade Center rather than One World Trade Center as a whole. Moreover, the _Streamline_ court continued the sentence relied upon by MIMCO by saying where the POR should be tied to: "the acquisition of replacement office space and the installation of the plaintiff's personal property in that space," which was a process that Streamline controlled.[2] _Id._ If this Court were to follow that reasoning, the POR in this case should be tied to MIMCO's efforts to resume its operation at a different facility. In any event, _Streamline_ does not support MIMCO's argument that the POR should be tied to the duration of its contract with DFA.

Here, the Policy's POR provision is not ambiguous. It

---

[2] The entire passage reads: "It is wholly unreasonable to think that the period of restoration should be tied to the rebuilding of real property over which neither the insured nor the insurer had any control, instead of tying it to a process that the plaintiff controlled: the acquisition of replacement office space and the installation of the plaintiff's personal property in that space." _Streamline_, 2003 WL 22004888 at *8.

explicitly provides that the POR is "[t]he date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality;" or "[t]he date when business is resumed at a new permanent location." Because MIMCO never resumed operations at a new permanent location, the POR is based on when the "property at the described premises" – i.e., the Black Bear facility – "should be" rebuilt. That the Black Bear facility was never rebuilt, which was out of MIMCO's control, and MIMCO ultimately ceased its services for DFA because it could not secure a comparable facility to Black Bear's, does not render void the POR provision for BI coverage. Indeed, the type of insurance at issue – for lost business income during a "suspension" of operations – contemplates that business will resume, rather than cease altogether. Even in the case where the business does cease altogether, the calculation of business income loss must be based on what the Policy says it will: the date when the repairs or rebuilding should have reasonably been completed.

Although relevant to the amount of business income loss MIMCO suffered, the duration of MIMCO's contract with DFA is irrelevant to the POR analysis. For example, if MIMCO's contract with DFA expired 12 months after the fire, the POR based on when the property "should be repaired, rebuilt or replaced with reasonable speed and similar quality" would still govern.

Moreover, the end date for BI cannot be based on a contract MIMCO entered into with a third party because it could have possibly continued in perpetuity. That the remainder of MIMCO's contract with DFA at the time of the fire was 48 months, with a 24-month renewal, is beside the point.

The Court's inquiry ends when an insurance policy's provision is clear, and a court should not "engage in a strained construction to support the imposition of liability or write a better policy for the insured than the one purchased." Oxford Realty Group Cedar v. Travelers Excess and Surplus Lines Company, 160 A.3d 1263, 1270 (N.J. 2017) (citations omitted). The inquiry into how the POR should be calculated begins and ends with the Policy because its language on that issue is clear. The POR is based on "[t]he date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality," not on the duration of MIMCO's contract with DFA.

Although the inquiry into how the POR is calculated is settled, the inquiry into the actual calculation is not. In MIMCO's pre-suit demand to Travelers in April 2015, MIMCO submitted a report by a public adjuster that calculated the POR to be 35 months based on the time it would take the Black Bear warehouse to be replaced with a similar facility. (Docket No. 37-10.) Travelers has determined the POR based on an assessment

17

that the Black Bear warehouse should have been replaced with a comparable facility in 23 months. Travelers contends that its calculation is undisputed, presumably because MIMCO's summary judgment focuses on the POR being based on the duration of the DFA contract rather than the hypothetical rebuild calculation. Travelers, however, has not cross-moved for summary judgment on this issue.[3] In order to grant summary judgment to a nonmovant, the Court must first give notice to the other party and provide a reasonable time to respond. See Fed. R. Civ. P. 56(f). Thus, the Court will deny MIMCO's motion for summary judgment, and provide leave to Travelers to move for summary judgment on the BI calculation if it believes it has a valid basis to do so. Cf. NN&R, Inc. v. One Beacon Ins. Group, 2006 WL 1765077, at *7 (D.N.J. 2006) (denying summary judgment on the adequacy of the insurance company's payments for business interruption losses because the parties had submitted proofs disputing the appropriate period of restoration).

### 2. *Travelers' motion for summary judgment*

In addition to BI, the Policy provides for Extended BI.

e. Extended Business Income

(1) Business Income Other Than "Rental Value"

---

[3] Travelers filed a separate motion for summary judgment on the Extended BI issue. It did not affirmatively move for summary judgment in its favor on the BI issue.

> If the necessary "suspension" of your
> "operations" produces a Business Income loss
> payable under this Coverage Part, we will pay for
> the actual loss of Business Income you incur
> during the period that:
>
> (a) Begins on the date property (except
> "finished stock") is actually repaired, rebuilt
> or replaced and "operations" are resumed; and
>
> (b) Ends on the earlier of:
>
>> (i) The date you could restore your
>> "operations", with reasonable speed, to the
>> level which would generate the Business
>> Income amount that would have existed if no
>> direct physical loss or damaged had
>> occurred; or
>>
>> (ii) 180 consecutive days after the date
>> determined in (1)(a) above, unless otherwise
>> stated in the Declarations or by
>> Endorsement.

(Docket No. 1-1 at 64.)  An endorsement to the Policy extends the

Extended BI from 180 days to 365 days.  (Docket No. 1-1 at 17.)

Travelers argues that the Extended BI provision only

applies when the premises is actually repaired, rebuilt or

replaced and "operations" are resumed.  Because the Black Bear

facility was never actually replaced, and MIMCO never resumed

operations there, Travelers contends that the Extended BI

provision is not applicable.  Travelers further argues that the

purpose of Extended BI is to provide coverage to an insured

during the time period after the property has been restored and

the insured essentially gets back on its feet and resumes

operations at the level it was operating before the loss.

MIMCO counters that the Policy expressly addresses the situation where MIMCO could not restore its operations, and demands that Extended BI be paid in this case. MIMCO also argues that Travelers' position is contrary to MIMCO's reasonable expectations because it paid a higher premium for expanded and extended coverage, and it is incongruous that MIMCO is entitled to less coverage because the loss was so severe.

To support its argument, MIMCO points to a provision in the Policy which states, "If you do not resume 'operations', or do not resume 'operations' as quickly as possible, we will pay based on the length of time it would have taken to resume 'operations' as quickly as possible." MIMCO argues that because this provision recognizes that the insured may not resume operations, the Extended BI provision must be interpreted to provide coverage for when MIMCO was unable to restore operations based on the hypothetical time it "would have resumed operations," or 365 days.[4]

As with the interpretation of the BI provision, the Court must first look to the language of the Policy to determine

---

[4] MIMCO briefly addresses the Extended BI issue in its motion for summary judgment on the BI issue, and argues that if the Court agrees with its position that the POR is 48 months based on its contract and not the hypothetical rebuild date, the issue of Extended BI would be moot. Because the Court does not agree with MIMCO on that issue, the Extended BI issue is ripe for consideration.

whether there is any ambiguity in the Extended BI provision.
The Court finds none.  It is clear that payment of Extended BI
has two explicit conditions: (1) it begins "on the date [the]
property . . . is actually repaired, rebuilt or replaced and
'operations' are resumed," and (2) ends on the date MIMCO could
restore its operations to the pre-fire level or 365 days later,
whichever comes first.  MIMCO did not meet the first condition,
because the property was not actually repaired and MIMCO did not
resume operations.  Thus, under the plain language of the
Policy, MIMCO is not entitled to Extended BI.

MIMCO's arguments to refute this interpretation are not
persuasive.  First, with regard to the provision that recognizes
the insured's inability to resume operations, that language is
not found in the Extended BI section, but rather in a section
for "Loss Determination," which concerns how business income
loss and extra expense will be determined based on the time and
nature of the insured's resumption of operations.  (Docket No.
1-1 at 71-72.)  The "Loss Determination" provision also contains
a subsection for "Resumption of Operations."  That subsection
provides that Travelers:

>    [W]ill reduce the amount of [MIMCO's]:
>
>    (1) Business Income loss, other than Extra Expense, to
>    the extent you can resume your "operations" in whole
>    or in part, by using damaged or undamaged property
>    (including merchandise or "stock") at the described
>    premises or elsewhere and, with respect to the

Business Income From Dependent Property Additional
Coverage, by using any other available source of
materials or outlet for your products.

(2) Extra Expense loss to the extent you can return
"operations" to normal and discontinue such Extra
Expense.

(Docket No. 1-1 at 71.)

The "Loss Determination" section then continues:

If you do not resume "operations", or do not resume
"operations" as quickly as possible, we will pay based on
the length of time it would have taken to resume
"operations" as quickly as possible.

(Id. 1-1 at 72.)

Despite MIMCO's reliance on this provision to support its

entitlement to Extended BI, it is evident that the Policy's

acknowledgement of a situation where the insured does not resume

operations is explicitly in the context of determining the

amount of business income loss and extra expense owed to the

insured.  This provision is relevant to MIMCO's claim for BI and

Extra Expense, but the language cited by MIMCO cannot be

imported into a separate provision unrelated to the provision's

subject matter – i.e., the Loss Determination provision only

concerns BI and Extra Expense, and not Extended BI.

Additionally, if the Extended BI provision were interpreted

as MIMCO argues, Extended BI would simply be duplicative of BI.

Where the BI provision concerns an estimation of when the

covered property should be restored, and the Loss Determination

provision concerns the estimation of the time it would have taken for the insured to resume operations as quickly as possible, the Extended BI provision does not rely upon estimations, but rather when the property is actually repaired, rebuilt or replaced, and when operations are resumed.  This difference between "would have" and "should have" in the BI provision and "actually did" in the Extended BI provision comports with the purpose of Extended BI, which "is to provide a cushion for the time after the 'Period of Restoration' when the insured is back in business but still not doing business at the same volume as before."  Shaw Mortg. Corp. v. Peerless Ins. Co., 615 F. Supp. 2d 1172, 1177 (S.D. Cal. 2009) (further explaining that "there would be no need for Extended Business Income coverage if the Policy generally provided for business income loss payments until the restoration of operations to a normal level").

The Court is not unsympathetic to MIMCO's observation that it is ultimately entitled to less coverage for a more severe loss over which it had no control.  Perhaps there is insurance to cover the total cessation of business or a contract that cannot be fulfilled, but that is not what the Travelers' Policy provides to MIMCO.  The Policy affords BI based on a period of restoration from the date MIMCO suspended operations until "[t]he date when the property at the described premises should

23

be repaired, rebuilt or replaced with reasonable speed and similar quality." The Policy affords Extended BI from "the date [the] property . . . is actually repaired, rebuilt or replaced and 'operations' are resumed," until MIMCO restores its operations to the pre-fire level or 365 days later. The POR based on an estimation of rebuilding governs the amount of BI MIMCO is entitled to, and the circumstances of MIMCO's loss do not meet the requirements for Extended BI. Consequently, Travelers' motion for summary judgment on MIMCO's claim for Extended BI coverage must be granted.

## CONCLUSION

For the reasons expressed above, MIMCO's motion for partial summary judgment must be denied. Travelers may move for summary judgment on MIMCO's claim for BI should it determine it is appropriate to do so. Travelers' motion for partial summary judgment on MIMCO's claim for Extended BI must be granted.

An appropriate Order will be entered.


Date: August 30, 2018                    s/ Noel L. Hillman
At Camden, New Jersey              NOEL L. HILLMAN, U.S.D.J.


24